UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KAREN TURNER,

        *Plaintiff*,

  v.

PETE BUTTIGIEG,

        *Defendant*.

Civil Action No. 23-1665 (LLA)

**MEMORANDUM OPINION AND ORDER**

      Karen Turner brings this action against Pete Buttigieg in his official capacity as Secretary of Transportation. Ms. Turner alleges that her employer, the Department of Transportation (the "Agency"), discriminated against her, created a hostile work environment, and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Pending before the court is the Agency's Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 9. For the reasons explained below, the court will grant the Agency's motion in part and dismiss Counts I and II in part and Counts III and IV in full.

**I.    Factual Background**

      The following factual allegations drawn from Ms. Turner's Complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion before the court, *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). The court further takes judicial notice of documents from the administrative proceedings that were attached to the complaint and briefing. *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018) (explaining that "[i]n employment discrimination cases, courts often take judicial notice of [Equal Employment

Opportunity Commission ("EEOC")] charges and EEOC decisions" in evaluating a motion to dismiss).

Ms. Turner, an African American woman, began working as a Program Analyst for the Agency in November 2013.  ECF No. 1 ¶¶ 1, 4.  In that job, she managed the hazardous materials ("HAZMAT") registration program for the Pipeline and Hazardous Materials Safety Administration.  *Id.* ¶ 5.  Shortly after she began working for the Agency, her Program Manager, David Donaldson, retired unexpectedly, and Ms. Turner took over his role.  *Id.* ¶ 9.  Mr. Donaldson, a white man, had managed the program "for years, to the point where no one understood what he did."  *Id.* ¶ 28.  He briefly trained Ms. Turner to take over his duties before he left.  *Id.* ¶ 10.

### A.   Discrimination

The Agency failed to give Ms. Turner the title of Program Manager even though she was filling Mr. Donaldson's previous role and job duties.  *Id.* ¶ 11.  When Ms. Turner demanded that she be given the "title and authority commensurate with the job she [was] actually doing," the Agency threatened to "take [her] duties away from her and give them to others."  *Id.* ¶ 24.  Emmanuel Ekwo, her supervisor at the time, withheld the title "because of her race and gender, and because of Defendant's general apathy toward[] and devaluation of her as an African American woman, compared to her white male counterpart, whom she replaced."  *Id.* ¶ 15.  Despite a lack of training by the Agency, Ms. Turner "familiarized herself with [Mr. Donaldson's former] job and mastered it."  *Id.* ¶ 30.  The Agency, however, "micromanaged" her and subjected her to "hyper-scrutiny."  *Id.* ¶¶ 30-31.

From 2014 to 2021, Ms. Turner's performance appraisal forms listed her role as a "Program Manager," and she was expected to perform at that level.  *Id.* ¶¶ 21-22.  She routinely received ratings of "outstanding" on her performance reviews.  *Id.* ¶ 31; *see id.* ¶ 23.  In 2021, the

Agency changed the role on her appraisal form to "Program Analyst." *Id.* ¶ 33.  The Agency informed Ms. Turner that this was because the title "Program Manager" was being "phased out," *id.* ¶ 34, but she later found out that the title still existed on the organizational chart, *id.* ¶ 35.

In early 2022, Mike Burkhardt, a white man, was hired and immediately "given high visibility and responsibility" even though "he had no experience in the HAZMAT program." *Id.* ¶¶ 38.  In February 2022, Ms. Turner was ordered to give him work she had prepared so that he could "present it . . . and receive accolades for [her] work." *Id.* ¶ 39.  This was one of several instances in which her "hard work was marginalized, and she was silenced in favor of a white male." *Id.* ¶ 42.

When Ms. Turner's colleague, Phyllis Curtis, went on leave, the Agency called on Ms. Turner to perform Ms. Curtis's duties as well as her own. *Id.* ¶ 43.  Instead of being praised for "going above and beyond her duties," her supervisor, Adam Lucas, gave her a lower performance rating. *Id.* ¶ 45.  Specifically, on August 2, 2022, for the first time since she had begun working in the HAZMAT Group, she received a rating of "exceeds expectations," which was one level lower than her previous ratings of "outstanding." *Id.* at 2, ¶¶ 31, 45.

Ms. Turner alleges that Mr. Burkhardt continues to be favored and "treated as if he can do no wrong, while [she] is marginalized, ignored, and denied both career advancement and the pay that comes along with that." *Id.* ¶ 47.  For example, Mr. Burkhardt was allowed to leave work early on Election Day in 2022 when Ms. Turner was not, and he was given training to do "Fitness Evaluations" when she was not. *Id.* ¶¶ 48-49.  Despite the Agency's reliance on Ms. Turner for her expertise and technical knowledge, the Agency refuses to "give her credit, authority[,] or opportunities for career advancement." *Id.* ¶ 53.

### B.      Hostile Work Environment

When Ms. Turner began working with the Agency, she was seated near Yolanda Braxton, Darrell Releford, and "a few other employees who were friendly with each other, but not with [her]." *Id.* ¶ 57. She was subjected to a "campaign of snide, denigrating comments, jokes about her in earshot, but not directly to her, constant running commentary, unprofessional and inappropriate behavior, and non-verbal behavior designed to intimidate and harass her." *Id.* ¶ 58. For these reasons, and because they spent so much time socializing, Ms. Turner nicknamed the group "the Country Club." *Id.* ¶ 60. On one occasion, one of her co-workers placed a countertop grill on Ms. Turner's desk and began grilling food while others gathered around, talking loudly. *Id.* ¶ 61. This not only distracted and irritated Ms. Turner, but also made her feel powerless. *Id.* ¶ 62. Mr. Releford made gestures and comments and stared at Ms. Turner with hostility. *Id.* ¶ 64. Another employee, Kenny Hartzog, would "freeze in his seat" and stare at Ms. Turner for extended periods, "for the express purpose of making her uneasy and insecure." *Id.* ¶ 65.

Twice in January 2014, Ms. Turner sought intervention from her then-supervisor, Aaron Mitchell. *Id.* ¶ 68. Mr. Mitchell told her that these employees would "eventually stop" and suggested that she "put her headphones on to ignore the taunting and denigrating comments." *Id.* ¶ 69. Also in January 2014, Ms. Turner complained to Roseanne Goodwill, the Head of the Office of Civil Rights. *Id.* ¶ 70. But because Ms. Turner feared retaliation, she did not file a formal Equal Employment Opportunity ("EEO") complaint and resorted to filing a grievance with her union. *Id.* Specifically, on January 24, 2014, she emailed union representative Tyler Patterson about the Agency's "refusal to intercede to stop the harassment and bullying that [she] was being subjected to." *Id.* ¶ 71. "In a move that violated Union practices," Mr. Patterson responded to the grievance by coming to Ms. Turner's open cubicle, within earshot of her co-workers, to discuss it. *Id.* ¶ 72.

4

For several months, despite Ms. Turner's repeated complaints about the work environment and continued requests to move to another location, the Agency refused to relocate her workstation. It did, however, move one of her white male co-workers when he complained about the distraction from the same employees. *Id.* ¶ 75. The Agency finally allowed Ms. Turner to move in April 2014, after she was taken to the hospital by ambulance to treat "a bout of severe hypertension from the stress she was enduring at work." *Id.* ¶¶ 79-80. While the move "slightly ameliorated" the situation, it did not "completely remedy the constant harassment" she was facing. *Id.* ¶ 80.

Ms. Turner continued to work in the office until the COVID-19 pandemic, when she was allowed to work remotely. *Id.* ¶ 81. She continues to work remotely. *Id.* While working remotely has mitigated her situation somewhat, she is still subjected to "harassment and bullying." *Id.* ¶ 82.

### C. Retaliation

Ms. Turner filed a formal EEO complaint in October 2022 alleging disparate treatment and a hostile work environment. ECF No. 9-3, at 2. In February 2023, she learned that she would be receiving a $750.00 cash bonus, which was a "dramatic[] reduc[tion] from [the] $4,150.00" bonus she "typically earned." *Id.* ¶ 84. Throughout her employment with the Agency, Ms. Turner had earned a bonus of at least $2,000.00 each year. *Id.* ¶ 85. Her performance rating for the 2022 rating period was "exceeds expectations," and she had not been subject to disciplinary action of any kind. *Id.* ¶ 45, 86. Ms. Turner complained about the smaller bonus to Mr. Lucas, who informed her that "he could not change his notes in her evaluation, when in fact, he could." *Id.* ¶ 87. Additionally, due to her protected activity, "she was placed on bi-weekly audit meetings . . . to scrutinize her position and duties," and she was removed from key meetings. *Id.* ¶¶ 92-94.

## II.     Procedural History

Ms. Turner first contacted an EEO counselor on September 16, 2022, and she filed a formal complaint on October 28.  *Id.* ¶ 83; ECF No. 9-3, at 2; *see* 29 C.F.R. § 1614.105(a) (setting forth the process for an informal complaint); 29 C.F.R. § 1614.106 (setting forth the process for a formal complaint).  In her formal complaint, Ms. Turner alleged disparate treatment and a hostile work environment based on race, sex, age, and retaliation for engaging in protected EEO activity.  ECF No. 9-3, at 1.  The Agency issued a final decision finding against Ms. Turner on August 8, 2023.  *Id.* at 35.

On June 8, 2023, Ms. Turner filed suit alleging disparate treatment on the basis of race (Count I), disparate treatment on the basis of gender (Count II), hostile work environment (Count III), and retaliation (Count IV).  Ms. Turner seeks $1.2 million in compensatory damages as well as attorney's fees and costs.  ECF No. 1, at 2; *see id.* ¶ 151.  The Agency has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 9, and the matter is fully briefed, ECF Nos. 11, 13.  In December 2023, the case was reassigned to the undersigned.  Docket, No. 23-CV-1665 (Dec. 15, 2023).

## III.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true.  *See Erickson v. Pardus*, 551 U.S. 89, 94

(2007); *see also Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). While a Title VII plaintiff need not establish a prima facie case of discrimination at the pleading stage, she must allege sufficient facts beyond mere legal conclusions to allow the court to draw a reasonable inference of discrimination from the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002). "If a Title VII plaintiff fails to plead 'sufficient factual matter' to state a discrimination claim that is 'plausible on its face,' then the district court should dismiss the case before discovery." *Chambers v. District of Columbia*, 35 F.4th 870, 878 (D.C. Cir. 2022) (en banc) (quoting *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015)).

In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)). As noted, the court may take judicial notice of the plaintiff's EEO materials without converting a motion to dismiss into one for summary judgment. *Golden*, 319 F. Supp. 3d at 366 n.2.

## IV.   Discussion

Ms. Turner alleges that the Agency violated Title VII by discriminating against her based on race and gender, creating a hostile work environment, and retaliating against her for engaging in protected activity. *See generally* ECF No. 1. The Agency argues that she failed to timely

exhaust several of her claims, ECF No. 9-1, at 7-12, and that she fails to state a claim on which relief can be granted for others, *id.* at 12-24. The court finds that Ms. Turner exhausted certain claims comprising Counts I, II, and IV, but failed to exhaust other aspects of those claims and her claim for a hostile work environment (Count III). On the merits, the court concludes that Ms. Turner has stated a claim with regard to one aspect of her disparate treatment claims (Counts I and II).

### A.   Exhaustion

A plaintiff may not initiate a civil action under Title VII until she has exhausted her administrative remedies for each discrete discriminatory or retaliatory act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Exhaustion allows federal agencies "to handle matters internally whenever possible." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). The exhaustion process begins when a federal employee "initiate[s] contact" with her agency's EEO counselor, which must be done within forty-five days of the alleged discriminatory or retaliatory act. 29 C.F.R. § 1614.105(a)(1). "Each discrete discriminatory act starts a new clock for filing charges alleging that act"—meaning that any claim arising out of an act not raised with an EEO counselor within forty-five days cannot be pursued. *Morgan*, 536 U.S. at 113.

The forty-five-day rule differs slightly in the context of hostile work environment claims, which "are different in kind from discrete acts." *Id.* at 115. By nature, hostile work environment claims "involve[] repeated conduct" and "therefore cannot be said to occur on any particular day"; rather, they "occur[] over a series of days or perhaps years." *Id.* Accordingly, a hostile work environment claim is timely "[p]rovided that an act contributing to the claim occurs within the filing period." *Id.* at 117. But the act must be one that "contribut[es] to the claim," *id.*—that is, the untimely and timely actions must be "adequately connected to each other . . . as opposed to

8

being an array of unrelated discriminatory or retaliatory acts," *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

If the employee's grievance is not resolved through informal counseling, the employee may file a formal complaint, which the agency investigates and adjudicates. 29 C.F.R. § 1614.106. The issues raised in the formal administrative complaint are the ones that may be addressed in later court proceedings. *See Bain v. Off. of the Att'y Gen.*, 648 F. Supp. 3d 19, 44 (D.D.C. 2022). "A complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." 29 C.F.R. § 1614.106(d). After a formal complaint is filed, the agency has 180 days to investigate (or 360 days in the event of an amendment). *Id.* §§ 1614.106(e)(2), 1614.108(e) & (f). If the agency does not timely provide a final decision by the relevant deadline, the employee may file suit in federal court. 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(b); *see In re James*, 444 F.3d 643, 644 (D.C. Cir. 2006).

The failure to exhaust administrative remedies is an affirmative defense, which means that the defendant bears the burden to plead and prove the plaintiff's failure to exhaust. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). The Agency argues that all of Ms. Turner's claims, except those stemming from her 2022 performance rating of "exceeds expectations" rather than "outstanding," must be dismissed for failure to timely exhaust administrative remedies. ECF No. 9-1, at 16. The court agrees.

### 1.   **Disparate Treatment (Counts I & II) and Retaliation (Count IV)**

As noted, the exhaustion inquiry for disparate treatment and retaliation claims focuses on each discrete act that is alleged by the employee. *Morgan*, 536 U.S. at 110-11. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed [administrative] charges," because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. Ms. Turner first contacted an EEO counselor

9

on September 16, 2022.  ECF No. 1 ¶ 83; ECF No. 9-3, at 2.  This means that any discrete acts of discrimination that occurred more than forty-five days prior—before August 2, 2022—are untimely.

The bulk of Ms. Turner's disparate treatment claims center on events that took place well before August 2, 2022.  For example, Ms. Turner alleges that, in 2014, she was not given the title of "Program Manager" when she took over Mr. Donaldson's duties after he retired.  ECF No. 1 ¶¶ 9-11.  She alleges that, while for several years she was evaluated as a "Program Manager," her 2021 performance appraisal listed her as a "Program Analyst," and she was falsely told that this was because the title of "Program Manager" was being "phased out."  *Id.* ¶¶ 33-34.  She further alleges that, in February 2022, Mr. Burkhardt was allowed to present her work at a team meeting and was otherwise treated better than she was.  *Id.* ¶¶ 39, 46-47.

Other allegations concern events that took place after September 16, 2022 but were neither included in Ms. Turner's formal EEO charge on October 28, 2022, nor the subject of an amendment.  These include her allegations that Mr. Burkhardt was permitted to leave work early on Election Day in 2022, while Ms. Turner was not, *id.* ¶ 48; that Mr. Burkhardt was given training to do "Fitness Evaluations," while Ms. Turner was not, *id.* ¶ 49; that there were occasions in 2023 when Mr. Burkhardt was praised for work Ms. Turner had actually done and when management gave recognition to other employees but excluded Ms. Turner's accomplishments, *id.* ¶¶ 50-51; and that Ms. Turner received a smaller bonus in February 2023, *id.* ¶ 84.

The only allegation Ms. Turner has timely exhausted is that, on August 2, 2022, she received a performance appraisal of "exceeds expectations" rather than "outstanding."  *Id.* ¶ 45;

ECF No. 9-3, at 2 ¶ 8.[1]  Ms. Turner resists this conclusion, arguing that, for example, her claim about being denied the title of "Program Manager" came to fruition after 2021 when she learned that management had lied to her about the title being phased out and thus may well be "within the statutorily required number of days of her EEO complaint."  ECF No. 11, at 15.  But her complaint fails to allege sufficient facts from which an inference could be drawn that she learned of this during the period between August 2 and September 16, 2022, especially when this allegation in her complaint—which proceeds chronologically—is followed by allegations about events that occurred in February 2022.  *Compare* ECF No. 1 ¶¶ 33-35 (allegations about title), *with id.* ¶¶ 38-39 (allegations about Mr. Burkhardt's favorable treatment in February 2022).

In any event, "[n]otice or knowledge of discriminatory motivation is not a prerequisite for a cause of action to accrue . . . . On the contrary, it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations."  *Walker v. Kendall*, No. 22-CV-119, 2022 WL 16758555, at *4 (D.D.C. Nov. 8, 2022) (alterations in original) (quoting *Fortune v. Holder*, 767 F. Supp. 2d 116, 122 (D.D.C. 2011)); *Moini v. LeBlanc*, 456 F. Supp. 3d 34, 45 (D.D.C. 2020) (collecting cases).  Therefore, any adverse actions that occurred in 2014 when she was not given the title of "Program Manager" upon Mr. Donaldson's retirement or in 2021 when her performance appraisal form listed her as a "Program Analyst" would have needed to be exhausted through informal contact with an EEO counselor within forty-five days of the action.

---

[1] The Agency EEO investigation concluded that three other allegations in her formal administrative complaint were timely, ECF No. 9-3, at 2 ¶¶ 7 (allegation that the Agency redistributed Ms. Turner's duties in August 2022), 9 (allegation that the Agency denied Ms. Turner's request to reconsider her evaluation on September 13, 2022), 10 (allegation that the Agency changed Ms. Turner's performance plan on September 29, 2022), but Ms. Turner does not raise these as discrete claims of discrimination or retaliation in her complaint to this court, ECF No. 1, ¶¶ 4-82, 83-94.

As for her allegations about events occurring after October 28, 2022, such as her smaller-than-expected bonus in February 2023, ECF No. 1 ¶ 84-85, Ms. Turner argues that she timely exhausted the allegation that her performance rating was downgraded on August 2, 2022, and that "its effect on Plaintiff's bonus payment[] would have naturally flowed from" that allegation.  ECF No. 11, at 19.  But the regulations provide a process for an employee to amend her EEO complaint when a new claim arises that is "like or related to those raised in the complaint."  29 U.S.C. § 1614.106(d).  Ms. Turner did not amend her complaint to add the allegation that she received a smaller bonus.  In the absence of an amendment, Ms. Turner tries to save this claim by referring to an undated affidavit she submitted during the EEO investigation.  ECF No. 11, at 20.  But this affidavit was not part of Ms. Turner's EEO complaint—instead, she shared this information as part of the EEO process at some point before the Agency issued its Final Agency Decision in August 2023.  "[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role."  *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (alteration in original) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)).  Ms. Turner has thus failed to exhaust a discrete claim of retaliation related to her bonus.

Finally, Ms. Turner does not attempt to argue that she exhausted other allegations in her complaint, such as that Mr. Burkhardt was allowed to leave early on Election Day while she was not, ECF No. 1 ¶ 48; that Mr. Burkhardt received training that she did not, *id.* ¶ 49; that she was "placed on bi-weekly audit meetings with the ASBG Audit team to scrutinize her position and duties," *id.* ¶ 92; that she was "removed . . . from key meetings," *id.* ¶ 93; or that she was "denied . . . step and grade increases," *id.* ¶¶ 108, 127.  The court will treat the Agency's arguments about Ms. Turner's failure to exhaust of these allegations as conceded.  *Nat'l Sec. Couns. v. C.I.A.*,

12

898 F. Supp. 2d 233, 268 (D.D.C. 2012) ("[T]he Court may treat the plaintiff's failure to oppose the defendant's 12(b)(6) arguments as a decision to concede those arguments."), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020). Accordingly, the Agency is correct that Ms. Turner has exhausted only her claim about her August 2022 performance evaluation in support of her disparate treatment and retaliation claims.[2]

### 2. Hostile Work Environment

The Agency argues that Ms. Turner's hostile work environment claim should be dismissed for failure to exhaust because the underlying allegations ended in March 2020 when Ms. Turner began to work from home and she raised no allegation contributing to the claim within forty-five days of September 16, 2022. The court agrees.

As previously explained, a hostile work environment claim is timely "[p]rovided that an act contributing to the claim occurs within the filing period." *Morgan*, 536 U.S. at 117. Ms. Turner's complaint contains several allegations that would have supported a hostile work environment claim in early 2014. For example, her allegations about members of the "Country Club" using her desk to grill food, staring at her, and otherwise disturbing her work environment are the type of pervasive conduct that could undergird a hostile work environment claim. ECF No. 1 ¶¶ 57-79. But Ms. Turner fails to allege an action that occurred within forty-five days of September 16, 2022 that is "adequately connected" to the types of actions she experienced in 2014. *Baird*, 662 F.3d at 1252. At most, she alleges that, after she was moved away from the "Country Club" in April 2014, the move "slightly ameliorated the situation, but did not completely remedy the constant harassment," ECF No. 1 ¶ 80, and that, after she was allowed to work from home

---

[2] Ms. Turner may, however, use non-exhausted "acts as background evidence in support of a timely claim" of discrimination or retaliation. *Morgan*, 536 U.S. at 113.

starting in March 2020, the hostile work environment "continue[d]," *id.* ¶ 81; *see id.* ¶ 82 ("Being able to work remotely has mitigated some, but not all[,] of the harassment and bullying that Plaintiff was subjected to."). But these are the type of "'naked assertion[s]' devoid of 'further factual enhancement'" that the court need not credit. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Accordingly, Ms. Turner has failed to administratively exhaust her hostile work environment claim.

\*   \*   \*

For the foregoing reasons, Ms. Turner may proceed on her claims of disparate treatment (Counts I & II) and retaliation (Count IV), but only as they pertain to her allegation that she received a performance rating of "exceeds expectations" rather than "outstanding" in August 2022.

### B.   Failure to State a Claim

The Agency argues that Ms. Turner cannot state a claim for disparate treatment or retaliation on the basis of her August 2022 performance rating. ECF No. 9-1, at 12-18 (disparate treatment), *id.* at 18-21 (retaliation). The court disagrees with respect to her disparate treatment claims but will dismiss her retaliation claim.

#### 1.   Disparate Treatment (Counts I & II)

Under Title VII, it is unlawful for an employer to discriminate against an employee with respect to their "compensation, terms, conditions, or privileges of employment" because of their "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff bringing a claim under Section 2000e-2(a)(1) must plead that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) a causal connection exists between her protected characteristic and the adverse employment action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Ms. Turner alleges that in August 2022, her supervisor gave her a performance rating of "exceeds expectations," rather than her usual rating of "outstanding," due to her race and sex. ECF No. 1, at 2. The Agency does not dispute that Ms. Turner, an African American woman, is a member of a protected class on the basis of her race and sex, but it argues that her lower evaluation was not an actionable adverse action. ECF No. 9-1, at 12-18. The court disagrees.

The Supreme Court recently clarified the standard for an actionable adverse employment action in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). There, the Court explained that a plaintiff must simply allege "some harm" regarding the terms or conditions of her employment to support a disparate-treatment claim. *Id.* at 350. That holding is largely consistent with the D.C. Circuit's recent decision in *Chambers*, in which the en banc Court held that a plaintiff need only show some change with respect to the terms and conditions of employment (as opposed to an "objectively tangible harm") to plead an adverse action.[3] 35 F.4th at 874-75. Although the parties briefed this case before *Muldrow* was decided, it applies. *See Thorpe v. Hous. Auth. of Durham*, 393 U.S. 268, 281 (1969) (explaining that a court must apply the law in effect at the time of its decision); *see also Overseas Shipholding Grp., Inc. v. Skinner*, 767 F. Supp. 287, 291 (D.D.C. 1991) ("[T]he Court must review the agency's decision under the lens of current legal precedent.").

The Agency first argues that the adverse-action standard enunciated in *Chambers* (and now *Muldrow*) does not apply to Ms. Turner's claims because she is covered by the federal-sector provisions of Title VII, whereas the plaintiffs in *Chambers* and *Muldrow* were not. ECF No. 9-1,

---

[3] *See Muldrow*, 601 U.S. at 364-65 (Kavanaugh, J., concurring) ("As I see it and as the D.C. Circuit saw it [in *Chambers*]," "[t]he discrimination is harm. The only question then is whether the relevant employment action changes the compensation, terms, conditions, or privileges of employment. . . . I expect that the [majority]'s approach and my preferred approach will land in the same place and lead to the same result.").

15

at 12-15. In the Agency's view, a federal-employee plaintiff may only bring a claim based on an adverse "personnel action" as defined by the Civil Service Reform Act, 5 U.S.C. § 2302(a)(2)(A)(i)-(xi). ECF No. 9-1, at 14-15.[4] The court disagrees. The D.C. Circuit has consistently held that the private- and federal-sector provisions of Title VII should be construed similarly. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007); *Singletary v. District of Columbia*, 351 F.3d 519, 523-24 (D.C. Cir. 2003); *see also Bain*, 648 F. Supp. 3d at 54 ("[The *Chambers* Court] did not so much as hint that the private-sector and federal-sector discrimination provisions should no longer be construed alike. If anything, it affirmed the status quo."). Moreover, the *Chambers* Court overruled *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), which itself involved a federal-sector employee. *See Chambers*, 35 F.4th at 882. This suggests that the *Chambers* Court intended its interpretation of the adverse action requirement to apply to all Title VII discrimination claims, not just those brought by private-sector employees. *See id*. Accordingly, the court will analyze Ms. Turner's claims under *Chambers* and *Muldrow*.

Ms. Turner's August 2022 evaluation, in which she was rated "exceeds expectations" instead of "outstanding," meets the standard of "some harm" to the terms and conditions of her employment under *Muldrow* because it represents a change that negatively impacted her work environment. 601 U.S. at 350. The Agency argues that the lower evaluation "is merely a 'trivial harm' that is not actionable under Title VII." ECF No. 9-1, at 17 (quoting *Liu v. Georgetown Univ.*, No. 22-CV-157, 2022 WL 2452611, at *9 (D.D.C. July 6, 2022)). But if the Agency lowered Ms. Turner's evaluation due to discriminatory animus, it is actionable. The following hypothetical from *Chambers* explains why: imagine "an employer that provides doughnuts every

---

[4] The Agency concedes that Ms. Turner's "'downgraded' performance evaluation . . . arguably qualifies as a personnel action under the Civil Service Reform Act," but contends that it is not sufficiently adverse under Title VII. ECF No. 9-1, at 17.

week for employees but hangs a 'whites only' sign over the doughnuts." 35 F.4th at 878. Being subjected to such a blatantly discriminatory workplace policy (even if the policy is doughnut distribution) is itself a harmful condition of employment. *See id.* To hold otherwise would "frustrate[] Title VII's purpose of ending discrimination in the workplace." *Id.* Thus, because Ms. Turner alleges that she received a lower rating on her performance evaluation based on her race or sex, she has alleged "some harm" to the terms and conditions of her employment sufficient to clear *Muldrow*'s low bar. 601 U.S. at 354 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 658 (2020)).

The Agency did not argue in its opening brief that Ms. Turner failed to allege a sufficient causal connection between her protected traits and her lower evaluation rating for purposes of her disparate treatment claims. *See* ECF No. 9-1, at 18-21 (arguing a lack of causation for Ms. Turner's retaliation claim). And its causation argument in its reply brief, ECF No. 13, at 9, comes too late, *see Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 n.\* ("[A]n argument first made in a reply brief ordinarily comes too late for our consideration." (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001))). Accordingly, the court will deny the Agency's motion to dismiss this aspect of Counts I and II.

## 2.     Retaliation

A plaintiff must allege three elements for a Title VII retaliation claim: (1) that she engaged in protected activity (i.e., "opposed any practice" unlawful under Title VII or "made a charge, testified, assisted, or participated" in an "investigation, proceeding, or hearing," 42 U.S.C. § 2000e-3(a)); (2) that she suffered a "materially" adverse action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'"; and (3) that there is a causal connection between the protected activity and adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219

(D.C. Cir. 2006)).  While the *Chambers* and *Muldrow* Courts changed the adverse-action standard for discrimination claims, both Courts clarified that the threshold did not change for retaliation claims, and thus the "materially adverse" standard remains.  *Chambers*, 35 F.4th at 877; *Muldrow*, 601 U.S. at 357-58.

The Agency first argues that Ms. Turner has not suffered a "materially adverse" action in the form of a lower performance evaluation.  The court disagrees.  Ms. Turner alleges that, as a consequence of her lower rating, she received a smaller bonus than she would have if she had received a rating of "outstanding."  *See* ECF No. 1 ¶ 87 ("When Plaintiff complained to Mr. Lucas about the reduction [in bonus], he told her that he could not change his notes in her evaluation[.]"); *see also* ECF No. 11, at 19 ("Plaintiff specifically [references] the effect of having her performance rating downgraded and the fact that this downgrade caused her financial loss."), 23 ("Defendant does not dispute that Plaintiff was docked the bonus she typically receives because her performance rating was reduced.").  While Ms. Turner did not exhaust a discrete claim that her *smaller bonus* was in retaliation for her protected EEO activity, *see supra*, Part IV(A)(1), her allegation that she received a smaller bonus due to her *lower performance rating* suggests that she experienced financial harm from the lower rating, *Morgan*, 536 U.S. at 113.  Because she has alleged financial harm stemming from her lower performance evaluation, she has alleged a sufficiently materially adverse action.  *Baloch*, 550 F.3d at 1199 (explaining that, in the retaliation context, "performance reviews typically constitute adverse actions . . . when attached to financial harms").

The Agency next argues that Ms. Turner has not alleged a sufficient causal connection between her EEO activity and her lower performance rating.  ECF No. 9-1, at 18-21.  Specifically, the Agency contends that Ms. Turner received her evaluation of "exceeds expectations" on

18

August 2, 2022, but she did not initiate informal contact with the EEO counselor until September 18. ECF No. 9-1, at 18 n.6 (citing ECF No. 9-3, at 19). The Agency is correct. Ms. Turner's August 2 performance rating of "exceeds expectations" could not have been in retaliation for her EEO activity over a month later on September 16. *See Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the allegedly retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff."). The court will therefore dismiss Ms. Turner's retaliation claim (Count IV).

## V.   Conclusion

For the foregoing reasons, it is hereby **ORDERED** that the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, ECF No. 9, is **GRANTED** in part and **DENIED** in part. Counts I and II may proceed only as they relate to Ms. Turner's receipt of a lower performance rating in August 2022. Counts III and IV are **DISMISSED** in their entirety. It is further **ORDERED** that the Agency shall file an answer to Counts I and II on or before October 15, 2024. Fed. R. Civ. P. 12(a)(4)(A).

**SO ORDERED.**

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date:   September 30, 2024